UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT BRIAN WATERHOUSE,

      Petitioner,

v.                               CASE NO. 8:12-CV-298-T-30MAP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

# O R D E R

    This cause is before the Court on Petitioner Robert Brian Waterhouse's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("petition") (Dkt. 1). Waterhouse is a Florida prisoner under sentence of death. Respondent filed a response to the petition (Dkt. 8), and Waterhouse filed a reply (Dkt. 12). Upon consideration of Waterhouse's claims, the Court has determined that the petition should be denied.

## BACKGROUND

    Waterhouse was convicted in 1980 of first-degree murder. He was sentenced to death. In 1983, the conviction and sentence was affirmed on direct appeal by the Florida Supreme Court. *See Waterhouse v. State*, 429 So.2d 301 (Fla. 1983). In 1988, however, the Florida Supreme Court granted Waterhouse's petition for writ of habeas corpus and vacated his death sentence because the trial court failed to instruct the jury to consider evidence of nonstatutory mitigating circumstances. *See Waterhouse v. State*, 522 So. 2d 341, 342 (Fla. 1988). The

case was remanded to the trial court for a new sentencing proceeding before a jury. *Id.* at 344.

After the resentencing proceeding, Waterhouse was again sentenced to death. In 1992, his sentence was affirmed by the Florida Supreme Court. *See Waterhouse v. State*, 596 So. 2d 1008 (Fla. 1992). His petition for writ of certiorari in the United States Supreme Court was denied on November 2, 1992. *See Waterhouse v. Florida*, 506 U.S. 957 (1992).

In 1994, Waterhouse filed a motion for post conviction relief pursuant to Rule 3.850, Florida Rules of Criminal Procedure. In January 1998, the state trial court denied the post conviction motion. On May 31, 2001, the Florida Supreme Court affirmed the denial of Waterhouse's post conviction motion. *See Waterhouse v. State*, 792 So. 2d 1176 (Fla. 2001).

In 2002, the Florida Supreme Court denied his petition for writ of habeas corpus. *See Waterhouse v. Moore*, 838 So. 2d 480, 484 (Fla. 2002).

In September 2003, for the first time, Waterhouse filed a motion for post conviction DNA testing in the trial court. He subsequently filed an amended motion for DNA testing. In July 2005, the trial court denied the motion for DNA testing because the evidence had been inadvertently destroyed by the Clerk's office. In October 2006, the Florida Supreme Court affirmed the order denying the motion for DNA testing. *See Waterhouse v. State*, 942 So. 2d 414 (Fla. 2006) [table].

On January 4, 2012, the Governor for the State of Florida signed a death warrant for Waterhouse. The execution is scheduled for February 15, 2012.

On January 10, 2012, Waterhouse filed a successive motion for post conviction relief in the trial court in which he raised two grounds for relief:

1.     EXECUTION SHOULD BE CONSTITUTIONALLY PROHIBITED WHEN A PERSON UNDER SENTENCE OF DEATH THAT HAS CONSISTENTLY AND CONTINUOUSLY MAINTAINED HIS INNOCENCE AND WHO IN GOOD FAITH FILES A MOTION FOR POSTCONVICTION DNA TESTING IN AN EFFORT TO ESTABLISH HIS INNOCENCE IS PROHIBITED FROM DOING SO DUE TO THE DESTRUCTION OF ALL EVIDENCE THROUGH THE NEGLIGENCE OF A GOVERNMENT AGENCY IN VIOLATION OF STATE LAW;

2.     MR. WATERHOUSE WAS DENIED AN ADVERSARIAL TESTING AT HIS CAPITAL TRAIL DUE TO FAILURE OF THE STATE TO DISCLOSE A MATERIAL WITNESS UNDER BRADY, THE PRESENTATION OF FALSE TESTIMONY UNDER GIGLIO IN LIGHT OF THE AFFIDAVIT OF MR. LEGLIO SOTOLONGO WHICH, IN THE ALTERNATIVE, MAY ALSO BE CONSTRUED AS NEWLY DISCOVERED EVIDENCE.

(Respondent's Ex. M2 at 197-251).  The trial court summarily denied the first claim, granted an evidentiary hearing on the second claim, and, after the evidentiary hearing, denied relief on the second claim on January 20, 2012.  On February 8, 2012, the Florida Supreme Court affirmed the order denying the successive motion for post conviction relief.  *See Waterhouse v. State*, 2012 Fla. LEXIS (Fla. 2012).  The Florida Supreme Court's mandate issued the same day.

On February 9, 2012, Waterhouse filed a petition for writ of certiorari and motion for stay of execution in the United States Supreme Court that were denied today, February 15, 2012.

Waterhouse filed the instant federal habeas petition on February 10, 2012. Respondent filed a response on February 13, 2012, and Waterhouse filed a reply on February 14, 2012.

## FACTS

In its opinion affirming Waterhouse's conviction and sentence in the initial direct appeal, the Florida Supreme Court set forth the salient facts as follows:

> On the morning of January 3, 1980, the St. Petersburg police responded to the call of a citizen who had discovered the dead body of a woman lying face down in the mud flats at low tide on the shore of Tampa Bay. An examination of the body revealed severe lacerations on the head and bruises around the throat. Examination of the body also revealed—and this fact is recited not for its sensationalism but because it became relevant in the course of the police investigation— that a blood-soaked tampon had been stuffed in the victim's mouth. The victim's wounds were such that they were probably made with a hard instrument such as a steel tire changing tool. Examination of the body also revealed lacerations of the rectum. The cause of death was determined to have been drowning, and there was evidence to indicate that the body had been dragged from a grassy area on the shore into the water at high tide. The body when discovered was completely unclothed. Several items of clothing were gathered from along the shore at the scene.

> The body showed evidence of thirty lacerations and thirty-six bruises. Hemorrhaging indicated the victim was alive, and defense wounds indicated she was conscious, at the time these lacerations and bruises were inflicted. Acid phosphotase was found in the victim's rectum in sufficient amount to strongly indicate the presence of semen there. Also, the lacerations in this area indicated that the victim had been battered by the insertion of a large object. The medical examiner was also able to determine that at the time of the murder the victim was having her menstrual period.

> After several days of investigation the police were unable to identify the victim, so they announced the situation to the public. They then received an anonymous telephone call simply informing them of appellant's automobile tag number and advising them to investigate it.

The police also learned the identity of the victim from two of her neighbors. These two acquaintances, Yohan Wenz and Carol Byers, testified at trial that they went to the ABC lounge with the victim on Wednesday night, January 2, 1980. They testified that they later left the lounge and that Ms. Kammerer remained there at that time. Kyoe Ginn, who was working there as a bartender that night, testified that the victim came into the bar with a man and a woman, that they later left, that Ms. Kammerer then began talking with appellant (who was known to the witness) and that at about 1:00 a.m. appellant and Kammerer left the bar together.

On the evening of January 7, 1980, police officers asked appellant to voluntarily go with them to police headquarters for an interview. At this time he said that he did not know any girl named Debbie and that he went to the ABC lounge on January 2 but did not leave with a woman. After this interview appellant was allowed to leave but his car was impounded for searching pursuant to warrant. The automobile was searched on January 8 and appellant was arrested on January 9.

Detectives Murry and Hitchcox arrested appellant. In the car on the way to the police station, after advising appellant of his rights, Hitchcox asked him, "We were right the other night, weren't we, when we talked to you about being involved in this case?" Appellant responded simply, "Might." Shown a picture of Deborah Kammerer, appellant this time admitted that he did in fact know her.

On the afternoon of January 9, the detectives again interviewed appellant. Detective Murry testified concerning this interview. She said that appellant became emotionally upset and said repeatedly that his life was over, that he was going to the electric chair. He said that he wanted to talk to his interviewers as people and not as police officers. He then said that he had some personal problems with alcohol, sex, and violence.

The two detectives interrogated appellant again on January 10. Again appellant said he wanted to talk to them as people rather than as police officers. Detective Murry testified that appellant again indicated that he experienced a problem involving sexual activity. He said that when he drinks a lot, it is like something snaps and he then finds himself doing things that he knows are terrible and bad, and that he cannot control his behavior on such occasions. Appellant also told the officers that when he wanted to engage in sexual activity with a woman but learned that she was having her menstrual period, he would become frustrated and angry and that this is what had

happened the previous Wednesday night [i.e., the night of the murder]. He also said that he had had a lot to drink on Wednesday night.

Inspection of the interior of appellant's car revealed the presence of visible blood stains, and a luminol test revealed that a large quantity of blood had been in the car but had been wiped up. Analysis of the blood in the car and comparison with known blood samples of appellant and the victim revealed that the blood in appellant's car could have come from the victim but was not appellant's blood.

A forensic blood analyst testified that it is possible through analysis of blood stains on certain surfaces to make estimates concerning the direction and velocity of motion of the blood making the stains. This witness concluded from her analysis that the blood in appellant's car was deposited in the course of a violent attack.

A forensic hair analyst testified that hairs found in appellant's car were consistent in their characteristics with known hair samples from the victim.

A forensic fiber analyst testified that fibers found in the debris adhering to the victim's coat were similar to fibers from the fabric of the seat cover in appellant's car. Also, fibers were found in the car that had the same characteristics as fibers from the victim's coat and pants.

Appellant was employed as a plaster and drywall worker. His foreman testified at trial that on the morning of January 3, appellant arrived at work asking for the day off. He appeared to have a hangover and said he was feeling rough. The witness said that at this time appellant had scratches on his face. The witness also said that appellant had told him that he liked anal intercourse and liked being with women who allowed themselves to be hit and slapped.

*Waterhouse v. State*, 429 So. 2d at 302-04.

## STANDARDS OF REVIEW

Because Waterhouse filed his petition after April 24, 1996, this case is governed by

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d

880, 889-90 (11th Cir. 2003); *Maharaj v. Sec'y of Dept. of Corrections*, 304 F.3d 1345, 1346 (11th Cir. 2002). The ultimate issue with respect to each claim is whether the Florida Supreme Court's resolution of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). *Williams v. Taylor*, 529 U.S. 362 (2000); *Robinson v. Moore*, 300 F.3d 1320 (11th Cir. 2002); *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318 (11th Cir. 2002). The standard Waterhouse must meet could not be higher; it is not enough that the state court "got it wrong." Petitioner must show that the state court's decision was objectively unreasonable. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor, supra*).

In the event constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). The test is "less onerous" than the harmless error standard enunciated in *Chapman v. California*, 386 U.S. (1967). "The test is whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637. Although no constitutional error has occurred in Waterhouse's case, any possible error would be harmless beyond any reasonable doubt based on the facts and the record.

7

No evidentiary hearing is required because none of Waterhouse's claims turn on any unresolved issue of fact. All involve issues of law argued on the basis of the existing record.[1]

**Procedural Default**

A section 2254 application cannot be granted unless a petitioner "has exhausted the remedies available in the courts of the State; . . ." 28 U.S.C. 2254(b)(1)(A); *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998). In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). *See also, Henderson v. Campbell*, 353 F.3d at 891 ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.")(quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)); *Duncan v. Henry*, 513 U.S. 364, 365 (1995)("[E]xhaustion of state remedies requires that the state prisoner 'fairly present' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]'") (citation omitted).

Under the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).

---

[1] The state post-conviction court conducted evidentiary hearings. Its findings are "presumed to be correct" (28 U.S.C. § 2254(e)(1)) and there is no showing that its decision "was based on an unreasonable determination of the facts. . ." (28 U.S.C. § 2254(d)(2)).

"The doctrine of procedural default was developed as a means of ensuring that federal habeas petitioners first seek relief in accordance with established state procedures." *Henderson*, 353 F.3d at 891 (quoting *Judd v. Haley*, 250 F.3d at 1313).

Pre-AEDPA decisions from the Supreme Court establish the framework governing procedural default in federal habeas cases. A procedural default will only be excused in two narrow circumstances. First, petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the default. "Cause" ordinarily requires petitioner to demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court. *Henderson*, 353 F.3d at 892; *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995).

To show "prejudice," the petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his factual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). The petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Henderson*, 353 F.3d at 892.

Second, a petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if such review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Henderson*, 353 F.3d at 892. This exception is only available "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually

innocent." *Henderson*, 353 F.3d at 892. The fundamental miscarriage of justice exception concerns a petitioner's "actual" innocence rather than his "legal" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001) (citing *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986) (explaining a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent"). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

"[A] claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon*, 523 U.S. at 559 (quoting *Schlup*, 513 U.S. at 324) ("given the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected") (internal quotation marks omitted). The *Schlup* Court stated the petitioner must show constitutional error coupled with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. This fundamental miscarriage of justice exception is not available unless "the petitioner shows, as a factual matter, that he did not commit the crime of conviction." *Ward v. Cain*, 53 F. 3d 106, 108 (5th Cir. 1995)(denying certificate of probable cause)(footnote omitted).

**DISCUSSION**

**I.       Timeliness of Petition**

Respondent argues that Waterhouse's petition is untimely because it was not filed within one year of his state conviction becoming final excluding any tolling periods for state post conviction proceedings (Dkt. 8 at dkt. p. 50).[2]

The AEDPA statute of limitation expressed in 28 U.S.C. § 2244(d) provides:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitations period shall run from the latest of -

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by a State action in violation of the Constitution or laws of the United States is removed, if the applicant is prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

---

[2]Respondent also argues that the petition is untimely under § 2244(d)(1)(D) (Dkt. 8 at 73-82).

In the Eleventh Circuit, "a single limitation period applies to a whole petition and...the limitation period for the whole petition runs one year from the latest of the triggering events established in section 2244(d)(1)(A)-(D)." *Zack v. Tucker*, 2012 U.S. App. LEXIS 491, at *6 (11th Cir. Jan. 9, 2012) (citing *Walker v. Crosby*, 341 F.3d 1240, 1245 (11th Cir. 2003)).

In light of this rule, this Court concludes that the petition is timely because Ground II of the petition, the *Brady* claim, is timely under section 2244(d)(1)(D). The factual predicate of that claim could not have been discovered through due diligence until Mr. Sotolongo contacted Waterhouse's attorney in January 2012, and informed him that Detective Hitchcox's police report included false information regarding the statement Mr. Sotolongo gave to Detective Hitchcox in 1980 (See Dkt. 1-3 at dkt. pp. 2-12).

## II.    Ground I

"THE FLORIDA SUPREME COURT DECISION HOLDING THAT THE NEGLIGENT DESTRUCTION OF EVIDENCE BY A STATE AGENCY DOES NOT REQUIRE A NEW PROCEEDING OR ACT AS A BAR TO EXECUTION VIOLATES THE EIGHTH AMENDMENT BAN ON CRUEL AND USUAL PUNISHMENT AND THE FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS."

Waterhouse asserts that pursuant to "[e]volving standards of due process under the Fifth, Eighth, and Fourteenth Amendments[,]" execution of an individual who has consistently maintained his innocence should be constitutionally prohibited when the individual, in good faith, has filed a motion for post conviction DNA testing to prove his innocence, but is precluded from obtaining DNA testing due to the "reckless, grossly negligent and/or negligent" destruction of the evidence by a government agency (Dkt. 1 at

12

12, 18).[3]  He further argues that where a government agency has negligently destroyed potentially exonerating evidence, a "mature society will not accept execution under the Eighth Amendment." *Id.* at 21.  In sum, Waterhouse asks this Court to recognize that he has a fundamental constitutional right not to be executed where he has maintained his innocence, and is precluded from obtaining DNA testing on evidence used at trial to convict him because a government agency negligently destroyed the evidence.   These claims are procedurally defaulted and precluded from review in this Court.

When Waterhouse raised these claims in his successive Rule 3.851 motion, the trial court denied them as improperly pled under Rule 3.851(d)(2)(B), procedurally barred, successive, and untimely (Respondent's Ex. M3 at 340-42).  When Waterhouse appealed the denial of his successive Rule 3.851 motion, the Florida Supreme Court expressly stated that the destruction of evidence issue was improperly pled in a successive Rule 3.851 motion, procedurally barred, successive, and untimely. *Waterhouse*, 2012 Fla. LEXIS at *29-42.

Generally, before a claim is procedurally barred from federal habeas review, a state court must reject reviewing an incorrectly presented claim. The fact that a federal habeas petitioner failed to abide by a state procedural rule does not, standing alone, prevent a federal court from reaching the federal claim: "The state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." *Harris v. Reed*, 489

---

[3]In 2003, Waterhouse moved for post conviction DNA testing on blood found in his vehicle and on his clothes, serology evidence recovered from the victim at the autopsy, the victim's clothes, and hair evidence (Respondent's Ex. L1 at 1).  The Clerk of the Court for the Sixth Judicial Circuit, Pinellas County, Florida, erroneously destroyed the evidence in 1988. *Id.* at 10-28.

U.S. 255, 262 (1989) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985)).  A state court's procedural ruling constitutes an independent and adequate state rule of decision if (1) the last state court rendering a judgment in the case clearly and expressly states that it is relying upon a state procedural rule to resolve the federal claim without reaching the merits of the claim, (2) the state court's decision rests solidly on state law grounds and is not intertwined with an interpretation of federal law, and (3) the state procedural rule is not applied in an "arbitrary or unprecedented fashion," or in a "manifestly unfair manner." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (citing *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990)).

The state trial court rejected Waterhouse's claims as improperly pled, procedurally barred, successive, and untimely.  The Florida Supreme Court expressly affirmed the application of the procedural bars, and did not reach the merits of the claims.  Florida courts consistently apply the procedural rule that a second or successive Rule 3.851 motion which is filed outside the one-year limitations period articulated in Rule 3.851(d)(1)[4] and does not fall within a recognized exception to the one-year limitations period under Rule 3.851(d)(2)[5]

---

[4]Rule 3.851(d)(1) states, "Any motion to vacate judgment of conviction and sentence of death shall be filed by the prisoner within 1 year after the judgment and sentence become final."

[5]Rule 3.851(d)(2) states:

 (2) No motion shall be filed or considered pursuant to this rule if filed beyond the time limitation provided in subdivision (d)(1) unless it alleges:

(A) the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence, or

(B) the fundamental constitutional right asserted was not established within the period provided for

(continued...)

is untimely. *See Walton v. State*, 2011 Fla. LEXIS 2797, 36 Fla. L. Weekly S 702 (Fla. Dec. 1, 2011) (Rule 3.851(d)(1) prohibits the filing of a post conviction motion more than one year after a judgment and sentence of death become final unless the motion falls within a recognized exception to the one-year limitations period under Rule 3.851(d)(2)); *Peterka v. State*, No. SC08-1413, order at 2, 15 So. 3d 581 (Fla. May 22, 2009) (unpublished order) (denying successive rule 3.851 motion as untimely where the defendant raised "a variant on a claim that he has already raised in prior proceedings by relying upon evidence that has been known since his trial").[6]

Thus, his due process and cruel and unusual punishment claims pertaining to the destruction of evidence are procedurally defaulted. Waterhouse fails to demonstrate cause and prejudice excusing his default, and fails to show that the fundamental miscarriage of justice exception applies. Waterhouse presents no evidence that could satisfy the difficult standard set forth in *Schlup*. *See Schlup v. Delo*, 513 U.S. at 324; *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). Therefore, these claims are procedurally barred from federal review.[7]

---

[5](...continued)
in subdivision (d)(1) and has been held to apply retroactively, or

(C) postconviction counsel, through neglect, failed to file the motion.

[6]Waterhouse does not argue that his claim fell under one of the Rule 3.851(d)(2) exceptions to the one-year limitations period.

[7]As the Florida Supreme Court noted, "Waterhouse presents no authority to support the proposition that [his claim that the destruction of the evidence was a bar to execution] is not ripe until a warrant is signed." *Waterhouse*, 2012 Fla. LEXIS at *31 n.9.

Even if Waterhouse's due process claim were not barred from review, it would be denied on the merits.[8]  Waterhouse's argument is based on the Clerk of the Court's negligent destruction of evidence[9] approximately eight years after his trial and conviction.  In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Supreme Court held that due process is only violated when a defendant can show bad faith on the part of the police who failed to preserve potentially useful evidence.  Waterhouse avers, however, that *Youngblood* is not controlling in his case because it was not a capital case, and did not address whether reckless or

---

[8]In his amended Rule 3.853 motion for DNA testing, Waterhouse asserted that the destruction of the evidence was a due process violation and a violation of the prohibition against cruel and unusual punishment (Respondent's Ex. L1 at 55-56).  On appeal from the denial of the motion for DNA testing, however, Waterhouse asserted only a violation of due process claim (Respondent's Ex. L3 at 18-45).  He did not assert an Eighth Amendment cruel and unusual punishment claim. *Id.*  Consequently, he did not exhaust his cruel and unusual punishment claim at that time.  *See Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) ("'[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process, including review by the state's court of last resort, even if review in that court is discretionary.'") (citing *O'Sullivan*, 526 U.S. at 845); *Sweet v. State*, 810 So. 2d 854, 870 (Fla. 2002) (holding claims raised on appeal from order denying post conviction relief are procedurally barred if petitioner receives an evidentiary hearing and does not fully brief each issue in his appeal brief); Fla. R. App. P., Rule 9.142(a)(2) ("On appeals from orders ruling on applications for relief under Florida Rule of Criminal Procedure 3.851 or 3.853, and on resentencing matters, the [briefing] schedules set forth in rule 9.140(g) will control."); Fla. R. App. P., Rule 9.140(g) ("Initial briefs *shall* be served within 30 days of service of the record or designation of appointed counsel, whichever is later. . . .") (emphasis added).  When Waterhouse presented his cruel and unusual punishment claim in 2012, both the state trial court and the Florida Supreme Court denied the claim as improperly pled under Rule 3.851(d)(2)(B) and untimely (Respondent's Ex. M3 at 340-42; *Waterhouse*, 2012 Fla. LEXIS at *29-42).  Accordingly, it is clear that the state courts' denial of Waterhouse's Eighth Amendment cruel and unusual punishment claim rests on independent and adequate state grounds barring federal review of the claim.  However, in its opinion affirming the denial of Waterhouse's 2012 successive Rule 3.851 motion, the Florida Supreme Court stated in pertinent part that "Waterhouse's *due process* challenge to the destruction of evidence in his case was previously fully presented, considered, and rejected by both the former postconviction court and this Court."  *Waterhouse*, 2012 Fla. LEXIS at *30 (emphasis added). Therefore, it is less clear whether the due process challenge to the destruction of evidence is procedurally defaulted.  Accordingly, this Court will also address the due process claim on the merits.

[9]During a move of the courthouse by court clerks, a decision was made that evidence which could legally be destroyed was to be destroyed rather than moved (Respondent's Ex. L1 at 48).  The evidence in Waterhouse's case was inadvertently destroyed in 1988 when the clerks who were destroying the evidence utilized a preliminary list that included items that were under consideration for destruction, which included Waterhouse's case, rather than a final, approved list, which did not include Waterhouse's case. *Id.*

negligent destruction of evidence by a government agency would bar an execution on due process considerations.

Destruction of evidence issues are analyzed in federal courts under *California v. Trombetta*, 467 U.S. 479 (1984) and *Youngblood*.  In *Trombetta*, the Supreme Court explained that:

> [w]hatever duty the constitution imposes on the states to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

467 U.S. at 479-80 (footnote omitted) (citation omitted). Under the two-prong *Trombetta* test, the Government violates a defendant's right to due process when: 1) it destroys evidence whose exculpatory significance is "apparent before" destruction; and 2) the defendant remains unable to "obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. *Youngblood* extended *Trombetta* to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was "potentially useful" for the defense, then a defendant must show that the Government acted in bad faith in destroying the evidence. *Youngblood*, 488 U.S. at 58.

To invoke *Trombetta*, a defendant must demonstrate that the government destroyed evidence possessing an "apparent" exculpatory value. *Trombetta*, 467 U.S. at 489. However, to trigger the *Youngblood* test, all that need be shown is that the government destroyed "potentially useful evidence." *Youngblood*, 488 U.S. at 58. *Youngblood* defined "potentially

17

useful evidence" as evidence of which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id*. at 57.

In Waterhouse's case, it can be objectively concluded from the state court record that Waterhouse did not alert anyone, prior to the time he requested DNA testing in 2003, that the blood, serology evidence, the victim's clothes, and the hair evidence  was apparently exculpatory. But it is "potentially useful," and the *Youngblood* rule rather than the *Trombetta* rule is applicable to his case.

When the evidence in question is only "potentially useful" to the defendant, the defendant must show that the government agency acted in bad faith when destroying the evidence to sustain a due process challenge. *Youngblood*, 488 U.S. at 58. Waterhouse does not allege and did not raise facts in state court or this Court that would show that the Clerk acted in bad faith in not preserving the evidence.

The element of bad faith requires more than a showing of the intentional destruction of potentially exculpatory evidence. Waterhouse must show that the Clerk was aware of the exculpatory value of the destroyed evidence and made a conscious effort to prevent Waterhouse from securing the evidence. *See Youngblood*, 488 U.S. at 57 (presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed).   Since there has been no showing that the evidence would have been exculpatory and no showing that the destruction of the evidence was motivated by bad faith, no due process violation occurred.  *Youngblood*.

18

Although Waterhouse correctly asserts that *Youngblood* was not a capital case, he cites to no case law, controlling or otherwise, which supports his argument that *Youngblood* is inapplicable to destruction of evidence issues in death penalty cases. This Court's research reveals that federal courts continue to apply the *Youngblood* analysis to failure to preserve evidence issues in death penalty cases. *See e.g., Allen v. McNeil*, 2009 U.S. Dist. LEXIS 30694, at *30-32 (S.D. Fla. Mar. 31, 2009). Therefore, this Court concludes that pursuant to *Youngblood*, Waterhouse has not established a violation of due process.

"Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the. . .state court's decision 'was contrary to' federal law then clearly established in the holdings of this Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). In denying the due process claim raised in Waterhouse's amended Rule 3.853 motion, the state trial court ruled that pursuant to *Youngblood*, there was no due process violation because Waterhouse failed to show bad faith was involved in the destruction of the evidence (Respondent's Ex. L1 at 59). Waterhouse argues that the state courts' denial of his due process claim involved an unreasonable application of clearly established federal law (see Dkt. 1 at 6, 17-19) because the courts "failed to consider the necessity for an evolutionary development since issuance of [*Youngblood*], which would bar an execution

where evidence used at trial to convict a defendant is destroyed in a capital case even if there is not a finding of bad faith." (Dkt. 1 at 19).

"[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by" the Supreme Court. *Harrington v. Richter*, 131 S. Ct. at 786 (quoting *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009) (internal quotation marks omitted)). Waterhouse has not identified any Supreme Court precedent establishing a specific rule which bars "an execution where evidence used at trial to convict a defendant is destroyed in a capital case even if there is not a finding of bad faith." To the contrary, Waterhouse asked the state courts, and now this Court, to change (in his words "to evolve") existing Supreme Court law. It is not the place of this Court to change established Supreme Court law, but to ensure that it is reasonably applied by state courts.

Waterhouse fails to demonstrate that the state court's decision to deny his due process claim was an unreasonable application of clearly established federal law. Accordingly, Ground I does not warrant federal habeas relief.

## III.    Ground II

"THE FLORIDA SUPREME COURT DECISION HOLDING THAT THE STATE DID NOT VIOLATE BRADY V. MARYLAND BECAUSE THE STATE DID NOT WILLFULLY OR INADVERTENTLY SUPPRESS EXCULPATORY OR IMPEACHMENT EVIDENCE AND THAT THE EVIDENCE DID NOT DEMONSTRATE A REASONABLE PROBABILITY THAT THE RESULT AT TRIAL WOULD HAVE BEEN DIFFERENT UNDER BRADY AND NEWLY DISCOVERED EVIDENCE IS UNREASONABLE AS IT OVERLOOKS AND/OR CONFLICTS WITH THE SIXTH AMENDMENT'S RIGHT TO COUNSEL, TO CONFRONT THE STATE WITNESSES AND THE RIGHT TO COMPULSORY PROCESS"

After the victim's body was found on January 3, 1980, Detective Gary Hitchcox ("Hitchcox") from the St. Petersburg Police Department was assigned to assist in the investigation of the case. On January 7, 1980, Hitchcox prepared a Supplementary Report which stated in pertinent part:

> At that time I felt it was necessary to contact the ID checkers or bouncers at the bar and make contact with a Leglio E. SOTOLONGO who was at the bar on Wednesday, 2 Jan 80. He advised he would contact everyone else he could think of that was working that night and would respond to the station. I interviewed him on the second floor at which time he ID'd himself as Leglio E. SOTOLONGO, WM/23, 8650 15 S/N, phone 576-3700. Stts that he works in Tampa and is manager of a candle shop, 1506 E. 7 Ave, Tampa, Fl 33605, phone 248-3559, and employed in the evening as an ID checker at ABC Lounge, 3535 4 S/N, phone 894-4875. He stts he has worked for ABC apprx 6 months and that on Wednesday, 2 Jan 80, he was off however was in the bar from 10 p.m. to 1 a.m. He was shown a photo of the vic and he sttd that he has seen her several times in the lounge however has never talked to her. He then saw several photos one of which was the susp WATERHOUSE and sttd that he knew WATERHOUSE by the name of BOB and that he comes in the bar several times a week. That he has had general conversation with this subj however does not remember when BOB left or when the vic left as this is not the type of thing he keeps track of.

(Dkt. 1-1 at dkt. pp. 9-10).

Sotolongo did not testify at Waterhouse's trial. Thirty-two years later, on January 9, 2012, Sotolongo signed an affidavit in which he said he read an article about Waterhouse's case in the Tampa Tribune on January 5, 2012. (Dkt. 1-3 at dkt. p. 4). The article indicated that Waterhouse was seen leaving the bar with the victim. *Id.* Sotolongo knew this was not true, and therefore he took steps to "get in touch with people connected to [Waterhouse's] case regarding what [he] knew." *Id.* On the date the victim was murdered, Sotolongo was employed as a doorman at the ABC Lounge ("ABC"). *Id.* at 2. He was at ABC on the night

21

the victim was murdered, but he does not recall whether or not he was working there that night. *Id.* At that time, Sotolongo knew Waterhouse because Waterhouse regularly went to ABC, and Waterhouse lived next door to a friend of Sotolongo's. *Id.* at dkt. p. 3. On the night of the murder, Sotolongo saw Waterhouse enter ABC at some time between 7 p.m. and 8 p.m. *Id.* When Waterhouse entered ABC that night, he paid back Sotolongo ten dollars that Sotolongo previously loaned to Waterhouse. *Id.* Sotolongo saw Waterhouse leave ABC that night with two white males some time before ABC closed at 2 a.m. *Id.* He did not see Waterhouse leave ABC with a female. *Id.*

Also in the affidavit, he stated that at some time after the murder, Hitchcox interviewed him. *Id.* at dkt. p. 4. He told Hitchcox that he saw Waterhouse leave ABC with two other men, but Hitchcox seemed disinterested in what he had to say. *Id.* He also stated that he was certain that he did not tell Hitchcox that he did not remember when Waterhouse left ABC, and that the portion of the Supplementary Report which implied that he told Hitchcox that he did not remember when Waterhouse left ABC was false. *Id.* at dkt. pp. 4-5.

Both of Waterhouse's trial attorneys signed affidavits on January 10, 2012, in which they indicated that they had relied on Hitchcox's Supplementary Report as being an accurate and truthful statement of what Sotolongo told the police. *Id.* at dkt. pp. 8, 11. Because they relied on the veracity of Hitchcox's report, and because the report indicated that Sotolongo did not have information about the night in question and did not suggest that Sotolongo would be a witness useful to the defense, the defense team did not contact Sotolongo. *Id.* at dkt. pp. 8-9, 11-12. After reading Sotolongo's January 9, 2012 affidavit, however, both

22

attorneys stated that had they known what Sotolongo actually knew about the night in question, they would have called him as a witness to impeach the testimony of the bartender who testified that she saw Waterhouse and the victim leave ABC together on the night of the murder, and to corroborate the testimony of Mr. Vasquez who testified that the victim left ABC alone,[10] and Waterhouse left with two men.  *Id.* at dkt. pp. 7-8, 10-11.

Waterhouse maintains that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) (holding that the State's failure to provide defendant with favorable, material evidence violates due process), and its progeny, by failing to disclose Sotolongo's actual statement to Hitchcox, and instead furnishing a false statement in Hitchcox's Supplementary Report. Waterhouse also asserts that the State's failure to provide Sotolongo's actual statement violated Waterhouse's rights under the Sixth Amendment to: 1) a fair trial; 2) present a defense through compulsory process of calling defense witnesses; 3) counsel; and 4) confront the State witnesses.  He contends that the state courts' denials of his claim was an unreasonable application of *Brady*.  He also avers that the Florida Supreme Court's decision "overlooks" his claims under the Sixth Amendment.

1.      **Sixth Amendment Claims**

To the extent Waterhouse asserts in Ground II of his petition that his rights under the Sixth Amendment to counsel, a fair trial, confront witnesses, and present a defense were violated by the State's failure to provide Sotolongo's actual statement, the claims must be

---

[10]Vasquez actually testified at trial that he did not see the victim leave ABC that night (Respondent's Ex. A10, p. 1946, lines 21-23).

denied as unexhausted.  Waterhouse did not raise these claims in the state courts.  He did not

raise the claims in either his successive Rule 3.851 motion (see Respondent's Ex. M2 at 214-

21), or in his briefs on appeal from the denial of the successive Rule 3.851 motion (see

Respondent's Exs. M5, M7).  Waterhouse fails to demonstrate cause and prejudice excusing

his default, and fails to show that the fundamental miscarriage of justice exception applies.

Accordingly, these claims are dismissed as unexhausted and procedurally barred.[11]  *See Smith*

*v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1339-40 (11th Cir. 2009) (petitioner failed to

exhaust his state remedies where he never raised claim anywhere in the state courts, and

procedural bar in that circumstance cannot be waived implicitly by the State's failure to

assert it); *McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005) ("the State's failure to

raise exhaustion does not constitute a waiver under AEDPA").

### 2.    *Brady* Claim

The Eleventh Circuit has articulated the *Brady* rule in the following way:

> To establish a *Brady* violation a defendant must prove the following: (1) that
> the Government possessed evidence favorable to the defendant (including
> impeachment evidence)...(2) that the defendant does not possess the evidence
> nor could he obtain it himself with any reasonable diligence...(3) that the
> prosecution suppressed the favorable evidence...and (4) that had the evidence
> been disclosed to the defense, a reasonable probability exists that the outcome
> of the proceedings would have been different.

*United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989)(internal citations omitted).  A

"reasonable probability" is one sufficient to undermine confidence in the outcome of the

---

[11]It is clear that the claim would be untimely and procedurally barred in state court if this Court dismissed the petition for lack of exhaustion.   See Fla. R. Crim. P., Rule 3.851(d)(2).

proceeding. *See United States v. Bagley*, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). To meet this standard, a defendant need not demonstrate that, after discounting the inculpatory evidence in light of the evidence in question, insufficient evidence existed to convict him. *See Taylor v. Singletary*, 122 F.3d 1390, 1395 (11th Cir. 1997) (citation omitted). Rather, the defendant must show that the suppressed evidence, reasonably taken, puts the whole case in such a different light as to undermine confidence in the verdict. *Id.* (quotation omitted).

Waterhouse raised a *Brady*/newly discovered evidence claim[12] in his successive Rule 3.851 postconviction motion; an evidentiary hearing was held; and the trial court denied relief in its January 20, 2012 Order Denying Defendant's "Successor Motion for Post-Conviction Relief":

> The Court finds that Waterhouse has not shown that the State committed a *Brady* violation on the basis articulated in Claim II for the reasons set forth below.
>
> **First Prong of *Brady***: As to the first prong, the Court finds that Sotolongo's testimony would impeach Ginn's trial testimony. Specifically, Sotolongo's statements could serve to impeach Ginn's testimony as to the time Waterhouse left the bar. Ginn testified that she saw Waterhouse and the victim leave the bar at around 1:00 a.m. (TT, p. 519.) While Sotolongo testified he is confident he saw Waterhouse leave between 12:00 a.m. and 2:00 a.m., and not 12:00 a.m. and 1:00 a.m., this discrepancy does not foreclose the finding that Sotolongo's testimony could have been impeaching in nature in connection

---

[12]Waterhouse also raised a claim pursuant to *Giglio v. United States*, 405 U.S. 150 (1972); however, he abandoned that claim during the evidentiary hearing (Respondent's Ex. M3 at 362).

with the time Waterhouse was seen leaving the bar. Sotolongo's testimony could also impeach Ginn's testimony that Waterhouse left with the victim, to the extent Waterhouse contends there was no evidence that he in fact came back to the bar after he was seen leaving with two men. In this regard, Sotolongo's testimony would also serve to corroborate Vasquez's testimony.

**Second Prong of *Brady*:** In reviewing the second prong of the *Brady* analysis, however, the Court finds that Waterhouse has not shown that the State suppressed the information from Sotolongo. Waterhouse essentially contends that Hitchcox's police report is false based on Sotolongo's evidentiary hearing testimony that he told Hitchcox during the January 7, 1980 interview that he saw Waterhouse leave the bar with two men on the night of January 2, 1980. Waterhouse alleges that the State violated *Brady* by not providing this information from Sotolongo to the defense at the time of trial. The Court is confronted with the conflicting evidentiary hearing testimony of Sotolongo and Hitchcox. Sotolongo testified that he told Hitchcox during the police interview that he saw Waterhouse leave the ABC Lounge with two men. Hitchcox, on the other hand, testified that if Sotolongo had told him this information, he would have included it in the police report. Hitchcox told the Court that it was his practice to write down pertinent pieces of information when conducting an interview and then to memorialize such information in a report. Hitchcox testified that any statement by Sotolongo that he saw Waterhouse leave with two men certainly would have struck him as pertinent and that it would have been part of the report. Hitchcox further testified that he believed Sotolongo's January 9, 2012 affidavit was "false."

It is uncontested that the State provided the police report in question to defense counsel prior to Waterhouse's trial. The affidavits of Attorneys Scherer and White, attached to Waterhouse's motion, provide that the State gave the defense the January 7, 1980 police report prior to trial. Additionally, Waterhouse confirmed this point on the record at the January 13, 2012 hearing. Waterhouse has not shown, however, that the report was in fact falsified. Hitchcox told the Court that in his capacity as a detective, he always followed the same procedures when conducting interviews and that he noted and included in his report pertinent information about the subject matter. Hitchcox further testified that had Sotolongo told him this information, it would have been "exciting" to him as a detective and that he would have written it in his notes and the report. Sotolongo maintains that the information he told Hitchcox at the time is not accurately represented in the report. While

Sotolongo testified that he told Hitchcox he saw Waterhouse leave with two men and that Hitchcox's report was inaccurate, he agreed that his memory as to events of January 2, 1980 is not as good now as it would have been at the time. Sotolongo also stated that he consistently believed he was working at the ABC Lounge that night. But he testified that he had to acknowledge that it was possible he was not working based on the same police report's statements that he was not working because, assuming it was correctly reported, the information he provided to law enforcement at the time likely would have been more accurate. Sotolongo also testified that he did not remember police showing him a photo of the victim, but deferred to the accuracy of the police report as to this point. The Court finds that Sotolongo's testimony, standing alone, is not sufficient to show that the State suppressed false evidence, as the defense must show under *Brady*.

Further, the Court finds that the description of Sotolongo's interview by Hitchcox is more reliable since it was reduced to writing at the time of the interview. Additionally, the passage of time and Sotolongo's weak recollection militate against the reliability of Sotolongo's statements.

**Third Prong of *Brady***: The veracity of the police report is not the dispositive consideration for this Court in its *Brady* analysis. Even assuming that Waterhouse met the second prong of this analysis by showing that the State had suppressed Sotolongo's statements, Waterhouse would not be entitled to relief because he would not be able to show prejudice under the third prong of the *Brady* analysis. As thoroughly discussed in section III.A of this order concerning the newly discovered evidence claim, the introduction of Sotolongo's testimony at trial would not have changed the outcome of this case in light of all the other evidence and testimony presented by the State. The Court emphasizes the following again here: evidence concerning Waterhouse's departure from the bar with two men was presented to the jury through the testimony of Vasquez; the testimony the jury heard from Vasquez left open the possibility that Waterhouse returned to the bar after initially leaving with two men; and the totality of the other uncontroverted evidence presented by the State, including Waterhouse's own incriminating statements, and the physical and circumstantial evidence against him, was of great importance. The Court finds that the introduction of Sotolongo's testimony would not have served to undermine confidence in the verdict in this case. *See Smith*, 931 So. 2d at 796. In conclusion, it is the Court's finding that Waterhouse is not entitled to relief under *Brady*.

27

(Respondent's Ex. M3 at 361-81).

The Florida Supreme Court affirmed the denial of the *Brady* claim as follows:

> Waterhouse next claims that the State violated *Brady* by failing to disclose Sotolongo's testimony to defense counsel. A *Brady* violation occurs when "(1). . . favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced." *Taylor v. State*, 62 So. 3d 1101, 1114 (Fla. 2011). This Court has expressed the standard of review of a *Brady* claim denial as follows:

>> *Brady* claims present mixed questions of law and fact. *See Sochor v. State*, 883 So. 2d 766, 785 (Fla. 2004). Thus, as to findings of fact, we will defer to the lower court's findings if they are supported by competent, substantial evidence. *See id*. "[T]his Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court." *Hurst [v. State,* [sic] 18 So. 3d 975, 988 (Fla. 2009)] (quoting *Lowe v. State*, 2 So. 3d 21, 30 (Fla. 2008)). We review the trial court's application of the law to the facts de novo.

> *Franqui v. State*, 59 So. 3d 82, 102 (Fla. 2011).

> In rejecting this claim, the postconviction court noted that it was faced with the conflicting testimonies of Sotolongo and Detective Hitchcox. The court ultimately found Detective Hitchcox's testimony with regard to the interview to be more reliable than that of Sotolongo because "it was reduced to writing" at the time of the 1980 interview. Further, the court found that the passage of time and Sotolongo's "weak recollection militate against the reliability of [his] statements." Because the postconviction court concluded that Hitchcox's depiction of the interview was accurate, it held that no favorable evidence was suppressed by the State.

> Waterhouse has not established that a *Brady* violation occurred. As with the newly discovered evidence claim, the postconviction court heard the testimony of Sotolongo, and concluded that Detective Hitchcox's testimony with regard to the 1980 interview was more reliable. Given the passage of time

28

and Sotolongo's admission that his memory of the interview was better thirty-two years ago than it was on January 17, 2012, we conclude that the postconviction court's finding is supported by competent, substantial evidence. *See Franqui*, 59 So. 3d at 102 (stating that this Court will not substitute its judgment for that of the postconviction court on issues of witness credibility). Thus, if the interview occurred as reflected in the report, and as testified to by Detective Hitchcox, then the State did not suppress impeaching evidence because the report was not false.

Moreover, even if this Court were to reject the postconviction court's determination of witness credibility, and conclude that the State suppressed impeaching evidence because Detective Hitchcox's report is false (which we do not), Waterhouse's claim would nonetheless fail because he cannot establish prejudice under *Brady*. In *Brady v. Maryland*, the United States Supreme Court held that the suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment. *See* 373 U.S. at 87. The Supreme Court has explained that to establish prejudice under the materiality prong of *Brady*, a defendant must demonstrate

> "a reasonable probability" that the result of the trial would have been different if the suppressed documents had been disclosed to the defense. As we stressed in *Kyles[ v. Whitley*, [sic] 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490, (1995)]: "[T]he adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. at 434.

> . . . [T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. *Id.* at 434-435. Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

*Strickler v. Greene*, 527 U.S. 263, 289-90 (1999); *see also Rodriguez v. State*, 39 So. 3d 275, 288 (Fla. 2010) (holding that defendant "failed to show prejudice—i.e., that 'the favorable evidence could reasonably be taken to put

the whole case in such a different light as to undermine confidence in the verdict.'" (quoting *Strickler*, 527 U.S. at 290)).

First, as previously discussed in the analysis of the newly discovered evidence claim, the testimony of Sotolongo, Vasquez, and Ginn are not necessarily inconsistent and can be reconciled. Sotolongo's testimony is not, therefore, actually impeaching. Second, even if Sotolongo's testimony could be viewed as impeaching, in light of Waterhouse's incriminating statements and the other evidence of his guilt, this cumulative testimony cannot "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435); *see Rodriguez*, 39 So. 3d at 288. Accordingly, Sotolongo's testimony fails the materiality and prejudice prong of *Brady*, and we conclude that the claim presented by Waterhouse is without merit.

*Waterhouse*, 2012 Fla. LEXIS at *57-62.

In assessing this claim, the state courts correctly identified the governing legal principle set forth in *Brady*. Further, Waterhouse has not cited to any decision of the United States Supreme Court that, faced with materially indistinguishable facts, reached a decision different from the state courts in this case. Therefore, the state courts' decisions were not "contrary to" governing United States Supreme Court precedent.

Moreover, the Court finds that the state courts' denials of the claim are supported by the record and are objectively reasonable. Arguably, Waterhouse has satisfied his burden under the second factor set forth in *United States v. Meros*, i.e., that he did not possess the evidence nor could he obtain it himself with any reasonable diligence. *Id*. at 1308. He has not, however, met his burden as to the other three factors.

As to the first and third factors, Waterhouse fails to show that the State possessed evidence favorable to him, and suppressed the evidence. In affirming the trial court's denial

of relief on Waterhouse's *Brady* claim, the Florida Supreme Court affirmed the trial court's finding that "the State did not suppress impeaching evidence because the report was not false." *Waterhouse*, 2012 LEXIS at *59. This factual finding is entitled to deference and Waterhouse fails to overcome this finding by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

The state courts found that Hitchcox's testimony at the evidentiary hearing with regard to his interview with Sotolongo in 1980 was more reliable than Sotolongo's testimony at the hearing regarding the interview because: 1) the interview was reduced to writing by Hitchcox at the time of the interview; 2) Hitchcox testified that it was his practice to write down any pertinent piece of information obtained during an interview, and had Sotolongo told him that he saw Waterhouse leave ABC with two men he would have considered that important and would have included that information in his report; 3) 32 years had passed from the time of the interview until the evidentiary hearing, and Sotolongo admitted that his memory was better at the time of the 1980 interview than it was at the time of the evidentiary hearing; and 4) Sotolongo had a weak recollection of the events that occurred on January 2, 1980.

A careful review of the transcript of the January 17, 2012 evidentiary hearing and the record persuades this Court that the state courts' fact finding and credibility determinations are supported by the record. The state courts' rejection of Waterhouse's claim is explicitly

31

based, in part, on the determination that Hitchcox's testimony was more credible than Sotolongo's. This Court cannot redetermine witness credibility when the state trial court has observed the witnesses' demeanor and this Court has not. *Marshall v. Lonberger*, 459 U.S. 422, 434-36 (1983).

Finally, this Court agrees with the state courts that Waterhouse has failed to establish the fourth factor set forth in *United States v. Meros*, i.e., prejudice. As previously stated, the prejudice or materiality requirement of *Brady* is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. at 682 (quotation marks omitted). During the evidentiary hearing, Sotolongo testified in pertinent part that he was at ABC on the night the victim was killed, but that he was not sure whether he was working at ABC that night. He also testified that he could not be sure what time Waterhouse left ABC that night, but that he did see Waterhouse leave with two white males, and did not see Waterhouse leave with a female (Respondent's Ex. M4 at transcript pp. 12-70). Thus, Sotolongo's testimony regarding the events on January 2, 1980, is essentially cumulative to Leon Vasquez's trial testimony regarding Waterhouse leaving ABC that night (Respondent's Ex. A10 at 1329-30).

In light of the evidence presented at trial, including Waterhouse's incriminating statements, and the significant physical and circumstantial evidence connecting Waterhouse to the murder, this Court concludes that there is no reasonable likelihood that Sotolongo's cumulative testimony could have affected the outcome in this case.

Based upon the foregoing, this Court concludes that Waterhouse has failed to show that the Florida courts' denials of Waterhouse's *Brady* claim was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or an unreasonable determination of the facts in light of the evidence presented.  Ground II fails on the merits.

ACCORDINGLY, the Court **ORDERS** that:

1.      Petitioner's petition for writ of habeas corpus and request for a stay of execution (Dkt. 1) are **DENIED**.  No motions for reconsideration of this Order will be entertained.

2.      The Clerk is directed to enter judgment against Petitioner, terminate any pending motions, and close this case.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Waterhouse is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue … only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Waterhouse "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484

(2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Waterhouse cannot make the requisite showing in these circumstances.

Finally, because Waterhouse is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE** and **ORDERED** in Tampa, Florida on February 15, 2012.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

SA:sfc
Copies furnished to:
Counsel/Parties of Record